MATTER OF CAMPTON

In Deportation Proceedings

A-11959846

*Decided by Board April 3, 1970*

Respondent, who is a crewman by occupation, and whose last entry was sought and gained solely in pursuit of his occupation, having served on a pleasure craft for which he was receiving remuneration but no regular salary, is statutorily ineligible for adjustment of status under section 245, Immigration and Nationality Act, as amended, notwithstanding his admission as a temporary visitor for pleasure upon presentation of a valid nonimmigrant visa. [*Matter of Rebelo*, Int. Dec. No. 1926, distinguished.]

CHARGE:

Order: Act of 1952—Section 241(a)(2) [8 U.S.C. 1251]—Nonimmigrant (temporary visitor for pleasure)—remained longer.

ON BEHALF OF RESPONDENT: Robert O. Wells, Jr., Esquire
Long, Mikkelborg, Wells & Fryer
912 Logan Building
Seattle, Washington 98101
(Brief submitted)

The 39-year-old respondent is a single male alien, a native and national of Australia. He completed an apprenticeship course for the trade of baker and pastry cook in his native land in 1951, and for the next seven years operated his own bakery shop in Tasmania. He sold that business in 1958, and since then has centered his life around racing and/or pleasure yachts.

The respondent's immigration record since 1958 shows many entries into the United States as a crewman, as a transit alien, and as a temporary visitor. But our concern here is limited to his more recent entries.

On April 28, 1967, the respondent obtained a nonimmigrant visa of the B-2 type (temporary visitor for pleasure) at the United States Consulate in Mazatlan, Sinaloa, Mexico. That document was valid for multiple application for admission at United States

ports until April 27, 1971. He was admitted to this country with it on April 30, 1967, for a period of six months. He remained beyond the authorized period of his admission, but was given permission to depart voluntarily on or before January 2, 1968, and he left for Canada on January 1, 1968.

The respondent last arrived in the United States at Blaine, Washington, by automobile, on March 4, 1968. On September 20, 1968, these deportation proceedings were instituted against him by the issuance and service of an order to show cause containing, *inter alia*, the following factual allegations:

\* \* \*

4. You were admitted as a nonimmigrant visitor for pleasure (B-2) to March 4, 1968;
5. You failed to comply with the conditions of your nonimmigrant status by accepting employment and you were directed to depart from the United States on or before August 6, 1968;
6. You have remained after August 6, 1968;

and charging him, on the basis thereof, with being subject to deportation under section 241 (a) (2) of the Immigration and Nationality Act (8 U.S.C. 1251), in that:

After admission as a nonimmigrant under section 101 (a) (15) of said act (8 U.S.C. 1101) you have remained in the United States for a longer time than permitted.

On September 30, 1968, a special inquiry officer granted the respondent the privilege of voluntary departure, but provided for his deportation from the United States to Canada, alternatively to Australia, on the above-stated charge, in the event of his failure to so depart. That decision became final for want of an appeal but the respondent who, on July 31, 1968, had become the beneficiary of an approved sixth preference visa petition, did not depart as authorized.[1] Instead, on April 4, 1969,[2] he successfully moved for a reopening of his deportation proceedings for the purpose of filing and prosecuting an application for adjustment of his status to that of a permanent resident.

On September 18, 1969, a second special inquiry officer left undisturbed the order entered by the prior special inquiry officer a year earlier, after finding that the respondent was a crewman and, thus, ineligible for relief under section 245 of the Immigration and Nationality Act (8 U.S.C. 1255), which reads:

The status of an alien, *other than an alien crewman*, who was inspected and admitted or paroled into the United States may be adjusted by the Attorney

---

[1] A visa number was not then available to him.

[2] By this time a visa number had become available.

General, in his discretion and under such regulations as he may prescribe to that of an alien lawfully admitted for permanent residence. * * *. (Emphasis supplied.)

The appeal from this latter decision,[3] which brings the case before this Board for consideration, contains the basic contention that the respondent does not fall within the statutory proscription.

Solution to the question thus raised requires reference to section 101(a)(10) of the Immigration and Nationality Act (8 U.S.C. 1101), which defines a "crewman" as "a person serving in any capacity on board a vessel or aircraft," and section 101(a)(15)(D) thereof, which further characterizes a "crewman" as one "* * * required for normal operation and service on board a vessel * * * who intends to land * * * in pursuit of his calling as a crewman * * *." We must read these two provisions of the law together with section 245 so that the statute will produce a harmonious whole. We conclude that, for the purposes of this case, two elements are required to constitute an alien a "crewman":

(1) He must be serving aboard a vessel in a capacity required for its normal operation; and
(2) He must be seeking (and gain) admission to this country because of his occupation in that role.

In our opinion, the following facts establish the existence of these two essential requirements in this case.

The respondent's modus vivendi since 1958, a period of 12 years, has primarily, if not exclusively, resulted in his presence and service aboard private vessels as skipper, mate, or cook and deckhand. Since 1962, except for a five months' vacation in Australia in 1964 and a three months' sojourn in Canada in 1968, *supra*, he has been connected with the yacht "Tatoosh," a pleasure craft of American registry based in Seattle. He does the general maintenance work on the vessel when it is in port (p. 33), and does the deckhand work, takes care of the engines, *etc.*, when it is at sea (p. 34). He is the only deckhand, and in addition, does the general cooking aboard (pp. 33, 34, 35). These factors convince us that the respondent is a crewman by occupation.

The respondent submitted in support of his visa petition, which was approved on July 31, 1968, a labor certification issued by a lawful representative of the United States Secretary of Labor.

---

[3] We are unable to determine from this record why respondent did not simply go to Canada and obtain his immigrant visa at the United States Consulate in Vancouver, where his petition had been sent.

his document certified the respondent for employment aboard e "Tatoosh" as a "specialty cook—able bodied seaman." The re-ondent stated in support of that document that for the preced-g five years he had managed the food buying for the "Tatoosh," in its galley, and done the catering for parties aboard it (Sup-ementary Statement B). These factors lead us to conclude that e respondent's last entry on March 4, 1968, was sought and ained solely in pursuit of his occupation.

It is immaterial that the respondent was admitted as a nonim-igrant temporary visitor for pleasure (B–2). The reason is that formal admission as a crewman is not required in finding that espondent, upon arrival, intended to pursue his calling as a crew-an aboard the "Tatoosh." In other words, it is substance rather han form which controls, and the former is adverse to the re-pondent. All we can add, in this connection, is that this case is actually distinguishable from one where an alien crewman, serv-ng and manifested as such, presents a B–2 visa and is admitted is a temporary visitor upon a showing that he is not entering in ursuit of his calling;[4] and that this respondent's ineligibility for elief stems from a specifically applicable statutory proscription ather than from an unsustained ground of deportability.[5]

It is of no assistance to the respondent that he has been profes-ionally trained as a cook and baker and has unchallenged redentials with respect to these occupations, or that his labor ertification shows clearly that his admission will not constitute iny infringement upon the job potential of any United States cit-zen. Even if he were employed only as the cook aboard the "Ta-oosh," he would still be a crewman.[6] Also, an affidavit sworn to y the respondent on February 1, 1968, apparently in connection with his visa petition, to the effect that he intended to immigrate to the United States as a specialty cook, viewed in the light of the fact that his home has been in the United States for the last 12 years (p. 21) and the timing of his visa and labor certification applications in relation to his last entry, might well militate against favorable exercise of relief as to the respondent, as a matter of discretion.[7]

We reject the contention that the respondent is not a "crewman" within the contemplation of the law because he has never served in the capacity of a merchant seaman aboard commercial vessels.

[4] *Matter of Rebelo,* Interim Decision No. 1926 (BIA, 1968).
[5] Cf. *Matter of T—,* 5 I. & N. Dec. 459 (BIA, 1953).
[6] Norris, *The Law of Seamen,* sec. 3.
[7] *Matter of Vega,* 11 I. & N. Dec. 337 (BIA, 1965).

Legally speaking, for administrative fine purposes under the Immigration and Nationality Act, we have held that the statute applies to "any vessel," including privately owned pleasure craft engaged in no commerce whatsoever,[8] and we see no reason to hold otherwise here. This is particularly true in view of the fact that section 101(a)(15)(D) of the statute specifically exempts from the term "a vessel" only a "fishing (commercial) vessel having its home port or operating base in the United States."

Finally, we are not impressed by the assertion that the respondent was merely a guest aboard the vessels on which he served, receiving only gifts, board and room, and no regular salary, until 1968 when, after his visa petition was approved, his employer started paying him wages of $500 a month. We agree with the special inquiry officer that this arrangement would be most unusual and unique, but would not affect the outcome of the respondent's case because, whatever he was getting, he was receiving some remuneration for the work he did. Our opinion in this respect is in no way altered by the respondent's testimony that for some time after he left Australia he received monthly payments from the sale of his business there for $4,000 (p. 32).

Accordingly, and in view of the foregoing, no change will be made in the special inquiry officer's order. All we need add is that, as we have pointed out in *Matter of Aguirre*, Interim Decision No. 1940 (BIA, 1969), the execution of the special inquiry officer's order has been stayed during the pendency of this appeal.

**ORDER:** It is ordered that the appeal be and the same is hereby dismissed.

*It is further ordered* that, pursuant to the special inquiry officer's order, the respondent be permitted to depart from the United States voluntarily within 30 days from the date of this decision or any extension beyond that time as may be granted by the District Director; and that, in the event of failure so to depart, the respondent shall be deported as provided in the special inquiry officer's order.

---

[8] See *Matter of HMS "Bounty,"* 10 I. & N. Dec. 391 (BIA, 1966).